Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio

★ ★ ★ ★ ★ ★ ★

**MEMORANDUM OPINION**

No. 04-08-00892-CV

**IN RE** Enrique **BENAVIDES**, Jr., M.D.

Original Mandamus Proceeding[1]

Opinion by:     Karen Angelini, Justice

Sitting:     Karen Angelini, Justice
             Rebecca Simmons, Justice
             Steven C. Hilbig, Justice

Delivered and Filed:   June 10, 2009

PETITION FOR WRIT OF MANDAMUS DENIED

At issue in this mandamus proceeding is whether the trial court abused its discretion in denying Dr. Benavides's second motion for sanctions and dismissal pursuant to former Article 4590i because the plaintiffs' expert report was conclusory as to causation and authored by an unqualified expert. Because we hold that the plaintiffs' expert was qualified and his report was sufficient, we deny the petition.

---

[1] This proceeding arises out of Cause No. 2001-CVQ-000-927-D1, styled *Oscar Puente, Individually and on Behalf of the Estate of Sandra Puente, Tanya Judith Puente, Roberta Jo Puente, Shanna Puente, and Charles Edward Puente v. Enrique Benavides, Jr., M.D.*, pending in the 49th Judicial District Court, Webb County, Texas, the Honorable Jose A. Lopez presiding.

## FACTUAL BACKGROUND

Because the underlying medical malpractice case was filed in June 2001, former Article 4590i applies. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351 cmt. (Vernon Supp. 2008) ("This Act applies only to a cause of action that accrues on or after the effective date of this Act [Sept. 1, 2003]."). In their petition, plaintiffs allege that Dr. Benavides committed medical malpractice when he failed to diagnose the decedent, Sandra Puente, with uterine cancer.

On August 19, 1999, Sandra Puente, who was fifty-one years old, went to see Dr. Benavides because she had post-menopausal bleeding. Dr. Benavides performed a pelvic examination and a pap smear. He then indicated on Puente's medical records that her pelvic examination and pap smear were normal. He diagnosed menorrhagia, prescribed hormones, and told Puente to return if the bleeding increased.

On September 20, 1999, Puente awoke drenched in blood and went to the emergency room. An ultrasound revealed that Puente had an enlarged uterus. A gynecologist performed a D & C, which revealed that Puente had advanced uterine cancer. Puente was transferred to MD Anderson Cancer Center, but treatment there was unsuccessful. On August 7, 2000, Puente died from the cancer.

In his petition for writ of mandamus, Dr. Benavides argues that the plaintiffs' expert report, which was authored by Gerald Bullock, M.D., is insufficient pursuant to former Article 4590i, because (1) it was authored by an unqualified expert, and (2) it was conclusory as to causation.

**STANDARD OF REVIEW**

Mandamus will lie only to correct a clear abuse of discretion that cannot be adequately remedied by appeal. *In re McAllen Med. Ctr., Inc.*, 275 S.W.3d 458, 467 (Tex. 2008) (orig. proceeding). In *In re McAllen*, 275 S.W.3d at 462, the defendant health care providers filed a petition for writ of mandamus, asking that the Texas Supreme Court issue a writ ordering the trial court to dismiss the plaintiff's lawsuit because the plaintiff failed to file an adequate expert report pursuant to former Article 4590i. In considering whether mandamus was appropriate, the supreme court explained that "[w]hether a clear abuse of discretion can be adequately remedied by appeal depends on a careful analysis of costs and benefits of interlocutory review." *Id.* at 464. The court noted that in medical malpractice cases, the Legislature had already balanced most of the relevant costs and benefits:

> After extensive study, research, and hearings, the Legislature found that the cost of conducting plenary trials of claims as to which no supporting expert could be found was affecting the availability and affordability of health care – driving physicians from Texas and patients from medical care they need. Given our role among the coordinate branches of Texas government, we are in no position to contradict this statutory finding. If (as appears to be the case here) some trial courts are either confused by or simply opposed to the Legislature's requirement for early expert reports, denying mandamus review would defeat everything the Legislature was trying to accomplish.

*Id.* at 466.

However, the court explained that mandamus would not lie in every case:

> [W]e acknowledge that mandamus review should not be granted in every pre-2003 case. The statute was intended to preclude extensive discovery and prolonged litigation in frivolous cases; *review by mandamus may actually defeat those goals if discovery is complete, trial is imminent, or the existing expert reports show a case is not frivolous.* But if the legislative purposes behind the statute are still attainable

through mandamus review, Texas courts should not frustrate those purposes by a too-strict application of our own procedural devices.

*Id.* at 467 (emphasis added).

The real parties in interest argue that mandamus should not lie in this case because discovery is substantially completed and trial is set for August 24, 2009. In support, they attached the trial court's docket control order. However, in reply to the response, relator argues that "a considerable amount of discovery remains." According to relator, the depositions of the experts have not yet been taken, which relator argues is "oftentimes the most time-consuming and costly part of any discovery." Relator points out that the real parties in interest's deadline to designate testifying experts was April 24, 2009, and attaches a letter from the real parties in interest requesting an additional thirty days in which to designate their experts for trial. According to relator, "[o]bviously, real parties in interest intend to designate replacement or additional experts and/or reports, and discovery is not substantially complete, trial is not imminent and there are no reports to show that this case is not frivolous." Thus, because it is disputed whether discovery is substantially completed and whether trial is imminent, we hold that mandamus review should lie.

### EXPERT REPORT

Dr. Benavides first argues that Dr. Bullock is unqualified to render an opinion with regard to causation. Dr. Bullock is a board certified obstetrician-gynecologist, is licensed to practice medicine in Texas, and has been actively practicing medicine during all times pertinent to the underlying litigation. In his expert report, he states that his field of medicine deals with "all gynecological issues, both malignant and non-malignant." His report states that he served his speciality training in gynecology at Wilford Hall USAF Medical Center, "the Air Force's largest and

most established cancer center for gynecological cancers." After his residency at Wilford Hall, he "continuously practiced in the field of obstetrics and gynecology for more than thirty years, in that time seeing countless gynecological cancer patients." And, according to his expert report, "[a]ll gynecological textbooks, used in practice on a regular basis, include current discussions of gynecological cancer." Dr. Bullock then states in his report that he has read Dr. Benavides's deposition and agrees with him on the topic of qualifications:

> Specifically, I agree with [Dr. Benavides] that Board Certified OBGYNs such as Dr. Benavides and myself are qualified to render opinions on causation in cases such as Mrs. Puente. I also agree with Dr. Benavides when he states under oath at page 22 of his deposition that the field of OBGYN includes detection and treatment of females with cancer. The reasons why he is correct include that a board certified OBGYN and an oncologist have co-extensive and overlapping expertise in the diagnosis, treatment, and care of patients with uterine sarcoma. I further agree with Dr. Benavides when he testified under oath at page 60-61 that an OBGYN can testify [about] causation in this case when he has reviewed the relevant material and literature in the area. I am qualified to render opinions on causation on matters related to OBGYN oncology and uterine sarcoma through my substantial training and experience in the area. I have also researched relevant material and literature in the area.

Indeed, in his deposition, Dr. Benavides admitted that if a board certified obstetrician-gynecologist reviews the relevant material, that obstetrician-gynecologist is qualified to offer opinions on causation and that he plans to offer his own opinion on causation. We therefore hold that Dr. Bullock is qualified to render his opinion.

Dr. Benavides also argues that Dr. Bullock's expert report is conclusory with respect to causation. A plaintiff who brings a health care liability claim must file an expert report that provides "*a fair summary* of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet

the standards, and the causal relationship between that failure and the injury, harm, or damages claimed." Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(a)(3), 1977 Tex. Gen. Laws 2039 (former TEX. REV. CIV. STAT. art. 4590i, § 13.01(r)(6)), *repealed by* Act of June 2, 2003, 78th Leg., R.S., ch. 204, § 10.11, 2003 Tex. Gen. Laws 847 (emphasis added). A report need not marshal all the plaintiff's proof; however, it must include the expert's opinion on each of the elements identified in the statute: standard of care, breach, and causation. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001).

According to Dr. Bullock's expert report, Dr. Benavides breached the standard of care of a gynecologist by (1) failing to "evaluate[] for uterine cancer, since postmenopausal bleeding is the hallmark presenting symptom of uterine cancer"; (2) failing to "[c]orrectly classify[] the postmenopausal bleeding"; and (3) treating the postmenopausal bleeding with hormones until the possibility of uterine cancer was eliminated. And, the expert report states that with regard to patients presenting with postmenopausal bleeding, a doctor should not treat with hormone therapy until ruling out uterine cancer for two reasons: (1) treatment with hormones causes an inherent delay in the final diagnosis and treatment of cancer; and (2) most uterine cancers grow at an accelerated rate under the influence of estrogens, thus decreasing the chances of survival. Dr. Bullock then states the following:

> I also agree with [Dr. Benavides] when he states at page 53 of his deposition that [Puente] went from early to the late stages of cancer in months because she had "a very aggressive type of cancer that grows very fast and spreads very fast also." It is my professional medical opinion, based on a reasonable medical probability, that the aggressive growth of Mrs. Puente's uterine cancer, and her eventual death, were directly and proximately caused by the negligence and failures of Dr. Enrique Benavides. Specifically, if he had diagnosed her uterine sarcoma on August 19, 1999, when her uterus was normal sized, based on a reasonable medical probability, her tumor was less advanced, it would have been easier to treat, and it is more likely than not that she would have survived. Instead, he began treatment with hormones, which

accelerates growth of uterine sarcoma. On August 18, 1999, Dr. Benavides diagnosed Mrs. Puente's uterus as normal. Just one month later, her uterus had increased to the size of a four to five month pregnancy. This indicates that the cancer fulminated after August 19th, proximately causing the rapid growth and spread of the patient's uterine sarcoma that led to her eventual death.

If Mrs. Puente had been treated for this cancer, instead of with hormones starting on or about August 19, 1999, there is a 51% or more chance that she would have survived because the fulminate and rapid growth stage of this cancer would have been avoided.

Thus, Dr. Bullock's opinion regarding Puente's probable survival is based on the following: (1) Puente's cancer was a very aggressive type of cancer that grows very fast; (2) according to her medical records, when Puente visited Dr. Benavides on August 19, 1999, she had a normal size uterus; and (3) a month later, when she went to the emergency room, she had the uterus the size of a four to five month pregnancy. Thus, Dr. Bullock concludes that because she had a normal size uterus on August 19, 1999, her tumor was small and that because her uterus grew to the size of a four to five month pregnancy during the next month, her cancer fulminated and entered a rapid growth stage. Thus, based on all those factors, Dr. Bullock concludes that had Mrs. Puente been properly diagnosed and not treated for hormones on August 19, 1999, she would have, more likely than not, survived. We conclude Dr. Bullock's expert report is not conclusory as to causation.

Therefore, we deny the petition for writ of mandamus.


Karen Angelini, Justice